IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


LAWANDA K. GOSS                              )
                                             )
v.                                           )        NO. 3:08-0473
                                             )
MICHAEL J. ASTRUE,                           )
Commissioner of Social Security             )



To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff retained sufficient residual functional capacity to perform jobs existing in significant numbers in the national and state economy is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), that the plaintiff's motion for judgment on the record (Docket Entry No. 14) should be denied, and that the defendant's motion for judgment on the record (Docket Entry No. 16) should be granted.

# I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on June 4, 2004, alleging disability due to degenerative disc disease and anxiety, with an onset date of March 20, 2003.[1] (Tr. 37, 39, 584-86.) Her applications were denied initially and upon reconsideration. (Tr. 47-48, 577-78, 580-83.)

A hearing was requested and held before Administrative Law Judge ("ALJ") Carmen Graves on October 3, 2006. (Tr. 33, 592.) The ALJ delivered an unfavorable decision on January 26, 2007 (tr. 15-23), and the plaintiff sought review by the Appeals Council. (Tr. 10.) On March 13, 2008, the Appeals Council denied the plaintiff's request for review (tr. 6-9), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on October 22, 1953, and was 49 years old as of March 20, 2003, her alleged onset date. (Tr. 100, 584.) She completed the tenth grade (tr. 100, 595) and her past relevant work experience includes twenty years as a food services worker with Aramark. (Tr. 61-66, 68.)

## A. Chronological Background: Procedural Developments and Medical Records

The plaintiff's medical records date back to 1991, and indicate that she was examined by multiple physicians, had a dermatological procedure and hormone replacement therapy, and was

---

[1] At the hearing before the ALJ, the plaintiff's counsel described the plaintiff's main impairment as "degenerative disc disease . . . in her lumbar, thoracic and cervical spine." (Tr. 594-95.) Although he noted that she also "does have obesity and anxiety," her back problems were "mainly . . . keeping her from working." *Id.* In her memorandum in support of her motion, the plaintiff asserts disability based on degenerative disc disease, morbid obesity, and depression and anxiety. Docket Entry No. 15, at 2.

diagnosed with hypertension and headaches. (Tr. 119-147.)  On August 13, 1997, the plaintiff presented to Dr. Jeff Lundy, her primary care physician, at the Jackson Clinic in Dickson, Tennessee, and he diagnosed her with anxiety, insomnia, and depression and prescribed Trazodone,[2] Xanax,[3] Remeron,[4] and Amitryptiline.[5] (Tr. 146.)

On February 8, 2002, the plaintiff presented to Dr. Paul Bergeron, at the St. Thomas Hospital Emergency Room, with complaints of back pain and a jammed right hand after slipping on ice at work. (Tr. 190.)  Dr. Bergeron noted that the plaintiff had diffuse lumbar and thoracic tenderness, with no bruising or lacerations, and a stable gait, and he rated her strength a five out of five throughout her body. *Id.*  An x-ray of the plaintiff's spine revealed some degenerative changes and disc space narrowing, but no evidence of a fracture or subluxation.[6] (Tr. 190, 192-93.) He diagnosed the plaintiff with an acute lumbar and thoracic back strain and prescribed Vioxx[7] and Mepergan.[8] (Tr. 190-91.)

---

[2] Trazodone is an antidepressant serotonin uptake inhibitor that may also be used for relief of anxiety disorders.  Saunders Pharmaceutical Word Book 716 (2009) ("Saunders").

[3] Xanax is a benzodiazepine anxiolytic used to treat panic disorders and agoraphobia and as a sedative. Saunders at 768.

[4] Remeron is used to treat major depressive disorder. Physicians Desk Reference 1160-61 (64th ed. 2010) ("PDR").

[5] Amitriptyline is a tricyclic antidepressant. Saunders at 43.

[6] Subluxation is defined as a partial or incomplete dislocation. Dorland's Illustrated Medical Dictionary 1779 (30th ed. 2003) ("Dorland's").

[7] Vioxx was withdrawn from the market in 2004, but was a nonsteroidal anti-inflammatory drug used to treat various forms of arthritis. Saunders at 756.

[8] Mepergan is a narcotic analgesic and sedative. Saunders at 437.

On February 11, 2002, the plaintiff presented to Sycamore Valley Medical Group ("SVMG") in Ashland City, Tennessee, with complaints of tingling and pain in her right arm. (Tr. 336.) Nurse practitioner Jennifer Campbell diagnosed the plaintiff with cervical radiculopathy[9] and trapezius spasms, and the plaintiff was prescribed Medrol,[10] Vioxx, Skelaxin,[11] and Ultracet.[12] (Tr. 337.) On February 13, 2002, an MRI revealed "[m]inimal spinal stenosis, C6-7, from disco-osteophytic bulge."[13] (Tr. 390.)

In February of 2002, Dr. William J. Dutton at Concentra Medical Centers examined the plaintiff several times and diagnosed her with a moderate cervical strain and cervical radiculopathy. (Tr. 514-15, 518-19.) He recommended physical therapy for the plaintiff (tr. 512), prescribed Naproxen[14] and Vioxx (tr. 514, 518-19), and referred her to an orthopedist. (Tr. 518.)

In February and March of 2002, the plaintiff returned to Dr. Lundy at the SVMG with complaints of neck pain, tingling in her right arm, anxiety, and depression, and he prescribed Xanax, Skelaxin, and Remeron. (Tr. 332-34.) On April 1, 2002, Dr. Paul McCombs, a neurosurgeon, reviewed a recent MRI on the plaintiff that revealed some abnormalities at the C6-7 level. (Tr. 493.) However, he concluded that the plaintiff's neurological exam was normal and recommended further

---

[9] Cervical radiculopathy is the irritation and improper functioning of nerve roots. Dorland's at 1562.

[10] Medrol is a corticosteroid and anti-inflammatory. Saunders at 433.

[11] Skelaxin is a skeletal muscle relaxant. Saunders at 646.

[12] Ultracet is a central analgesic for acute pain and fever reducer. Saunders at 738.

[13] Stenosis is the narrowing or stricture of a duct or canal; spinal stenosis is a narrowing of the nerve canal. Dorland's at 1757.

[14] Naproxen is a fast-absorbing nonsteroidal anti-inflammatory drug with analgesic and fever reducing properties. PDR at 2850-51.

evaluation with myelography.[15] *Id.*  On April 19, 2002, a myelography on the plaintiff revealed cervical radiculopathy. (Tr. 490.)  A CT scan of the plaintiff's cervical spine showed that she had posterior and anterior osteophytes,[16] decreased disc height and cervical spondylotic[17] changes at C5-6, a small disc bulge at C6-7, narrowed L5-S1 disc height, and mild spurring of the anterior L4 and L5 vertebral bodies. (Tr. 486-87.)  On April 24, 2002, Dr. McCombs wrote to Dr. Dutton, indicating that the plaintiff did not need surgery and referring her for "continued conservative management." (Tr. 485.)

In May of 2002, the plaintiff presented to Dr. Lundy, complaining of lower back and neck pain, anxiety, and depression, and he prescribed Bextra,[18] Ultracet, Soma,[19] Remeron, and Xanax. (Tr. 326-28, 330-31.)  On May 6, 2002, the plaintiff returned to Dr. Dutton with complaints of neck pain and a burning sensation that radiated from her neck to her back. (Tr. 508.)  Dr. Dutton noted that the plaintiff demonstrated full motor strength and range of motion, diagnosed her with a cervical strain, changed her prescription from Bextra to Vioxx, established a physical therapy schedule, and continued to limit her activity. *Id.*  In a May 13, 2002, letter to the plaintiff's attorney, Dr. McCombs indicated that her condition resulted in a 5% permanent partial impairment rating ("PPI") and that

---

[15] Myelography is "radiography of the spinal cord after injection of a contrast medium into the subarachnoid space." Dorland's at 1210.

[16] Osteophytes are bony outgrowths. Dorland's at 1336.

[17] Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating along the upper limbs as a result of pressure on the nerve roots." Dorland's at 1742.

[18] Bextra is a COX-2 inhibitor and nonsteroidal anti-inflammatory drug which was withdrawn from the market in 2005 due to safety concerns. Saunders at 95.

[19] Soma is a skeletal muscle relaxant. Saunders at 653.

she should avoid lifting in excess of 50 pounds or working with her hands over her head for "any protracted period of time." (Tr. 481.)

On May 30, 2002, April Philpot, a physical therapist with Star Therapy, completed a progress report on the plaintiff and indicated that she had attended three out of six appointments. (Tr. 506.) Ms. Philpot noted that the plaintiff reported mild improvement and was receptive to gentle stretching exercises, but that she still experienced pain in her lower back and legs and needed further evaluation of the source of her pain. *Id.* The next day, the plaintiff returned to Dr. Dutton for her final appointment and he determined that she had no permanent impairment from her cervical strain, opined that she could return to work that day, and recommended that she continue exercising at home and taking Aleve. (Tr. 500, 503.)

On July 3, 2002, the plaintiff presented to Dr. David W. Gaw, at Southern Hills Medical Center, with complaints of neck pain and lower back pain that worsened with bending, twisting, pushing, and pulling and that radiated into her legs. (Tr. 528-29.) Dr. Gaw noted that the plaintiff had pain but no weakness in her neck, normal neurological findings, tenderness in her paracervical area with no elicitable muscle spasms, minimal soreness in her lower back, and a palpable spasm in her left paralumbar muscles. (Tr. 529.) He diagnosed the plaintiff with "[a]ggravation of degenerative lumbar disc disease" and a "[h]istory of cervical strain." *Id.* Dr. Gaw also concluded that the plaintiff was not a candidate for surgery, could lift 50 pounds occasionally and 25 pounds frequently, and retained a 5% PPI due to her lumbar spine disorder but that she did not suffer from a cervical spine impairment. (Tr. 530.)

The plaintiff presented to Dr. Lundy in July, August, and September of 2002, with complaints of knee pain (tr. 322-24), neck pain (tr. 287), and radiating back pain. (Tr. 287, 320.)

Dr. Lundy diagnosed the plaintiff with left knee arthritis and a bulging disc in her neck and back, prescribed Lortab[20] and Bextra, and gave her hormone shots. (Tr. 288.)

On September 9, 2002, Dr. McCombs examined the plaintiff and noted that she had lower back and hip pain and that her pain level was a seven or eight out of ten. (Tr. 406.) A September 11, 2002, MRI on the plaintiff revealed degenerative-type signal loss at the L2-3, L3-4, L4-5, and L5-S1 levels, degenerative loss of disc height at the L5-S1 level, minor central stenosis in the L2-3 and L5-S1 levels, minor bilateral neural foraminal narrowing at the L2-3 level, severe bilateral neural foraminal narrowing and moderate posterior annular disk bulge with posterior osteophytosis at the L5-S1 level, and no evidence of fractures at any lumbar level. (Tr. 479.) On September 18, 2002, Dr. McCombs reviewed the plaintiff's MRI results and concluded that although the plaintiff suffered from "degenerative type changes," she was not a candidate for surgery. (Tr. 478.)

From September 23, 2002 to May 23, 2003, the plaintiff presented to Dr. Lundy at SVMG on several occasions, with complaints of back pain, anxiety (tr.305-11, 318-19), and elevated mood swings (tr. 289-90), and she was prescribed Remeron, Xanax, Soma, Ultracet, Lortab, and Bextra. (Tr. 283-85, 289-90, 305-11, 318-19.) On June 19, 2003, the plaintiff presented to Dr. James Baldwin at SVMG, complaining of knee and back pain, and he prescribed Lortab. (Tr. 281-82.) On July 10, 2003, she presented to Dr. Lundy with complaints of chronic left knee pain and he prescribed Lortab and recommended that she be scheduled for an MRI. (Tr. 279-80.)

Between August and November of 2003, the plaintiff presented to Dr. Lundy for multiple routine examinations and he did not change her prescribed medications. (Tr. 271-76.) A

---

[20] Lortab, also known as Hydrocodone, is a narcotic painkiller and fever reducer. Saunders at 415.

November 11, 2003, MRI revealed mild degenerative changes and no fractures in her left knee and mild degenerative disk disease at C5-6 and C6-7 in her lower back. (Tr. 148-49.) On December 2, 2003, the plaintiff presented to Dr. Lundy with complaints of back pain and insomnia, for which she was prescribed Lodine,[21] Zanaflex,[22] and Remeron. (Tr. 267-68.)

From December 31, 2003, to September 28, 2004, the plaintiff presented to Drs. Lundy and Baldwin for a variety of sinus-related ailments and she was prescribed Lortab, Xanax, Remeron, and Soma. (Tr. 243-266, 268, 427-28.) On February 26, 2004, Dr. Lundy noted that the plaintiff's medications were controlling her depression and anxiety and stabilizing her back pain. (Tr. 262.)

On October 5, 2004, Dr. Deborah Doineau, Ed.D., a Tennessee Disability Determination Services (DDS) consultative examiner, conducted a psychological examination of the plaintiff (tr. 151-56) and noted that her IQ was likely in the low average to borderline ranges and that she was taking Hydrocodone,[23] Alprazolam,[24] and Wellbutrin.[25] (Tr. 152-53.) Dr. Doineau opined that the plaintiff appeared capable of interacting appropriately with others, understanding instructions, concentrating and remembering, maintaining an adequate level of hygiene, using public transportation, managing funds, and adapting to changes in her environment. (Tr. 155.) She found

---

[21] Lodine is a nonsteroidal anti-inflammatory drug and analgesic prescribed for arthritis and chronic pain. Saunders at 412.

[22] Zanaflex is a skeletal muscle relaxant and antispasmodic used to treat a spinal cord injury. Saunders at 773.

[23] *See supra* n.21.

[24] Alprazolam is a benzodiazepine anxiolytic and sedative used for the treatment of panic disorders and agoraphobia. Saunders at 33.

[25] Wellbutrin is an aminoketone antidepressant used for the treatment of major depressive disorder. PDR at 1719-20.

that the plaintiff's persistence and pace was likely "hampered by her physical condition and to a moderate extent by her mental condition." *Id.* Dr. Doineau diagnosed the plaintiff with panic disorder with mild agoraphobia, bipolar tendencies, possible avoidant personality traits, deteriorating discs, and chronic back pain, and she assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 61.[26] *Id.*

On October 14, 2004, Dr. Jerry Lee Surber, a consultative DDS physician, conducted a physical examination on the plaintiff (tr. 157-62) and described her as morbidly obese, in no acute distress but "very, very anxious," and in "some discomfort during any type of movement activity." (Tr. 158.) Although he noted that she had no palpable masses and was able to complete a full range of motion with minimal discomfort, Dr. Surber found that the plaintiff's neck and spine were tender and that she had muscle spasms but no gross muscular asymmetry. (Tr. 158-59.) He also indicated that the plaintiff was capable of completing straight leg raise exercises "in the sitting and supine positions without complaints of pain," and straight away, heel-toe walks, and stand and squat exercises with complaints of lower back pain. (Tr. 160.) Dr. Surber diagnosed the plaintiff with: (1) low-back pain consistent with degenerative disk disease, with no limitation of function despite some evident discomfort; (2) mid-back and neck pain, with no limitation of function; (3) morbid obesity; and (4) depression and anxiety. (Tr. 160-61.) Based on his examination, Dr. Surber determined that in an eight hour workday, the plaintiff would be able to lift/carry less than ten

---

[26] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 61-70 falls within the range of "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

pounds occasionally for one-third of an eight hour workday, stand/walk for less than to two hours, with normal breaks, and possibly up to two hours, and sit for less than six hours. (Tr. 161.)

On October 21, 2004, Dr. James Moore, a non-examining, consulting DDS physician, completed a physical residual functional capacity ("RFC") assessment on the plaintiff (tr. 163-69) and opined that she could occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds. (Tr. 164.) He noted that the plaintiff could stand/walk or sit for about six hours in an eight hour workday, had unlimited capacity to push/pull, and could frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 164-65.) Additionally, Dr. Moore acknowledged that his findings were significantly different that those of the plaintiff's "treating or examining"[27] physician because he found the plaintiff's complaints to be only "partially credible to a med[ical] level." (Tr. 165, 168.)

On October 28, 2004, Dr. Frank Kupstas, a DDS consultative psychologist, completed a Psychiatric Review Technique Form ("PRTF") and a mental RFC assessment on the plaintiff. (Tr. 170-79.) In the PRTF, Dr. Kupstas indicated that the plaintiff had a generalized depressive disorder, anxiety disorder with mild agoraphobia, and possible avoidant traits. (Tr. 171-73.) He found that the plaintiff's mental impairments would mildly restrict her activities of daily living and moderately limit her ability to maintain social functioning, concentration, persistence, or pace. (Tr. 174.) In the mental RFC assessment, Dr. Kupstas noted that the plaintiff was moderately limited in her ability to maintain concentration and attention for extended periods of time; "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" "to complete a normal work-day and work week without interruptions from

---

[27] Presumably, Dr. Moore was contrasting his findings to those of Dr. Surber.

psychologically based symptoms;" "to interact appropriately with the general public;" and "to respond appropriately to changes in the work setting." (Tr. 177-78.)

In November of 2004, Dr. Lundy examined the plaintiff four times, administered hormone shots, and prescribed Meridia,[28] Wellbutrin, Lortab, Soma, Xanax, Demerol,[29] and Imitrex.[30] (Tr. 231-38.) On November 11, 2004, the plaintiff presented to St. Thomas Hospital Emergency Room with complaints of migraines and she was prescribed Phenergan[31] and Ibuprofen. (Tr. 181-83.) The plaintiff also reported that she did not have any pain or stiffness in her neck. (Tr. 182.)

On December 17, 2004, Dr. Lundy completed a medical opinion form (tr. 200-02) and found that in an eight hour workday the plaintiff could sit for three hours, for one hour at a time, and stand for two hours, for 30 minutes at a time. (Tr. 200.) He opined that the plaintiff could lift/carry 1-5 pounds frequently, 1-10 pounds occasionally, and 11-20 pounds infrequently. *Id.* Dr. Lundy noted that the plaintiff could occasionally use her hands for fine manipulation and stand on a hard surface, infrequently reach above her shoulders, and never bend at the waist. *Id.* Dr. Lundy also stated that the plaintiff's problems with stamina and endurance would require her to rest "more than the one 30-minute break and two 15-minute breaks" normally allowed during an eight hour workday, that her limitations and pain would preclude her from being able to work eight hours a day for five days a week, that she would need to be absent from work more than four days a month, and that she was incapable of maintaining her concentration and memory for a normal workweek. (Tr. 201-02.) From

---

[28] Meridia is prescribed for managing obesity and maintaining weight loss. PDR at 492-94.

[29] Demerol is a narcotic analgesic painkiller. Saunders at 208.

[30] Imitrex is prescribed for the acute treatment of migraine attacks. PDR at 1509.

[31] Phenergan is an antihistamine, sedative, and antiemetic. Saunders at 551.

December 21, 2004 to April 7, 2005, the plaintiff presented to Dr. Lundy seven times for medication refills, hormone shots, and treatment for sinus and cold problems. (Tr. 217-228.)

On May of 2005, the plaintiff presented to the Emergency Room of Centennial Medical Center in Ashland City, Tennessee, with complaints of chest pain and she was admitted to the hospital. (Tr. 415-21.) X-rays revealed that the plaintiff had a slightly enlarged heart (tr. 415, 422) and mild thoracic spine spondylosis, and she was diagnosed with "[n]ew onset atrial fibrillation"[32] and chest pain. (Tr. 211, 419.) On May 23, 2008, after her discharge from the hospital, a cardiogram was "basically normal." (Tr. 211.) However, on June 16, 2005, the plaintiff complained of tightness in her chest and shortness of breath, and an x-ray of her chest revealed calcified pulmonary granulomata[33] and borderline cardiomegaly, but no acute cardiopulmonary changes. (Tr. 414.)

In June, July, and August of 2005, the plaintiff presented to Dr. Lundy for hormone shots and medication refills and he continued to diagnose her with a back strain. (Tr. 215, 465-69.) On September 2, 2005, an MRI of the plaintiff's lower back revealed congenital fusion of the vertebral bodies at T10-11, mild spondylosis, and "mild bilateral foraminal stenosis" at L5-S1. (Tr. 463-64.) On September 21, 2005, the plaintiff presented to Dr. Lundy with complaints of radiating back pain, and she received hormone shots and had her medications refilled. (Tr. 461-62.) On September 23, 2005, Dr. Christian Vissers with Nashville Orthopaedic Specialists examined the plaintiff and diagnosed her with "[l]ow back pain with left lower extremity radicular pain." (Tr. 563.) Even though Dr. Vissers concluded that the plaintiff's neurological examination was completely normal,

---

[32] Atrial fibrillation is an abnormal heartbeat characterized by rapid randomized contractions of the atrial myocardium, resulting in irregular, often rapid, ventricular rate. Saunders at 627.

[33] Calcified pulmonary granulomata are groups of inflammatory cells with calcium deposits in the lungs that are formed by tissue damage. Saunders at 252, 716.

he recommended that Dr. Lundy refer her to a neurosurgeon or orthopedic spine surgeon since she complained of pain radiating down her left leg. *Id.*

The plaintiff presented to Dr. Lundy on October 12, 2005, with complaints that her pain medication was no longer alleviating her back pain, and Dr. Lundy altered the plaintiff's medication regimen by adding Neurontin.[34] (Tr. 459-60.)  The plaintiff returned to Dr. Lundy on October 19, 2005, and reported that Neurontin was not alleviating her back pain. (Tr. 457.)  Dr. Lundy diagnosed the plaintiff with chronic back pain and gave her hormone shots, but he did not change her prescribed medications. (Tr. 457-58.)  On October 26, 2005, the plaintiff presented to Dr. Lundy with complaints of sinus congestion and drainage, and he diagnosed her with sinusitis and prescribed Amoxil.[35] (Tr. 455-56.)

On November 7, 2005, the plaintiff presented to the Pain Management Clinic at Tennessee Professional Associates ("TPA") (tr. 550-58) and she reported that her level of pain was an 8 to 10 out of 10 in the preceding twenty-four hours. (Tr. 556-57.)  The plaintiff also complained of chronic lower back pain that radiated down her left leg, chronic neck pain that radiated down her arms, tingling in her left arm, frequent headaches, migraine attacks that occurred once a month, insomnia, and an anxiety disorder. (Tr. 550.)  The plaintiff was diagnosed with chronic sinusitis, gastroesophageal reflux disease ("GERD"), chronic neck pain and degenerative disk disease at C5-6 and C6-7, and chronic lower back pain and degenerative disk disease with tenderness at L2 through L5. *Id.*  The plaintiff was placed on a pain management plan that included dieting, exercise, physical

---

[34] Neurontin is an anticonvulsant and used to treat postherpetic neuralgia and nerve pain. Saunders at 488.

[35] Amoxil is used to treat infections of the ear, nose, and throat. PDR at 1312.

therapy, and using a PENS/TENS[36] unit fifteen to thirty minutes a day. (Tr. 551.) The plaintiff indicated that she had been prescribed Soma, Lortab, and Elavil,[37] but that she had not filled her Elavil prescription because it "makes her sick and drowsy." (Tr. 551, 558.)

The plaintiff presented to Dr. Lundy on November 16 and December 21, 2005, for sinus problems and she received hormone shots and medication refills. (Tr. 451-54.) On January 2, 2006, the plaintiff returned to TPA with complaints of frequent panic attacks, neck and lower back pain, and occasional tingling in both hands. (Tr. 549.) The plaintiff also reported that her medication had reduced her level of pain from an eight out of ten to a three out of ten. *Id.* The plaintiff was instructed to continue her weight loss program and back exercises, and she was prescribed OxyContin, Lortab, Soma, and Xanax. *Id.* On January 26, 2006, the plaintiff presented to SVMG and was diagnosed with degenerative disk disease in her lower back, anxiety, and GERD, given hormone shots, and prescribed Xanax, Prevacid, Motrin, and Ultram.[38] (Tr. 449-50.) The examining nurse practitioner also recommended that she begin or continue diet and exercise programs. (Tr. 450.)

In January and February of 2006, the plaintiff presented to TPA and she again reported that her medication had reduced her level of pain from an eight out of ten to a three out of ten. (Tr. 546, 549.) The plaintiff was prescribed OxyContin, Lortab, Soma, and Xanax and was encouraged to continue her weight loss and exercise programs. *Id.* The plaintiff also complained that she had a

---

[36] According to Drugs.com, a TENS unit is a small, battery powered device that is used to control many types of pain by sending mild electrical signals through electrodes attached to the skin. Drugs.com, "How to use a TENS unit"at http://www.drugs.com/cg/how-to-use-a-tens-unit.html.

[37] Elavil is a tricyclic antidepressant. Saunders at 256.

[38] Ultram is a central analgesic used to treat moderate to severe pain. Saunders at 739.

limited range of motion and that severe back and neck pain limited her ability to walk. (Tr. 546.) On March 14, 2006, the plaintiff presented to Dr. James Anderson at SVMG with complaints of anxiety and shortness of breath. (Tr. 447-48.) Dr. Anderson gave her hormone shots and changed her prescription from Xanax to Klonopin.[39] *Id.*

In March and April 2006, the plaintiff presented to SVMG and was diagnosed by a nurse practitioner with anxiety, prescribed Klonopin and Effexor,[40] and received hormone shots. (Tr. 443-46.) During the same two months, the plaintiff presented to TPA twice with complaints of back pain and reported that her medications reduced her level of pain from an eight out of ten to a four out of ten. (Tr. 541, 546.) The plaintiff's medications were not changed and she was encouraged to continue her weight loss and physical therapy programs. (Tr. 541.)

In May and June of 2006, the plaintiff returned to TPA and reported that her medications continued to reduce her level of pain from a nine out of ten to a four out of ten in May, and reduced her pain level from a nine out of ten to a two out of ten in June. (Tr. 535, 541.) The plaintiff was diagnosed with radiating pain and spasms in her lower back, encouraged to continue her physical therapy and weight loss programs, and prescribed Lortab, Soma, Xanax, OxyContin, Fastin,[41] and Maxzide. *Id.* In July and August of 2006, the plaintiff presented to TPA with complaints of arm pain and a limited range of motion in her back and legs. (Tr. 573, 575.) She reported that her medications

---

[39] Klonopin is indicated for the treatment of seizures and panic disorder, with or without agoraphobia. PDR at 2855.

[40] Effexor is indicated for the treatment of major depressive disorder. PDR at 3505.

[41] According to Drugs.com, Fastin is a central nervous stimulant and appetite suppressant used to treat obesity in patients with risk factors such as high blood pressure, high cholesterol, or diabetes. "Fastin" at http://www.drugs.com/mtm/Fastin.html.

reduced her level of pain from a nine out of ten to a two out of ten in July and from an eight out of ten to a one out of ten in August, and Celebrex[42] was added to her prescribed medications. *Id.*

The plaintiff presented to Dr. Anderson on August 28, 2006, with complaints of back pain and requested hormone shots. (Tr. 566.) He diagnosed the plaintiff with lumbosacral back pain and carpal tunnel syndrome, recommended that she undergo a left arm nerve study, and prescribed Darvocet[43] and Naproxen. (Tr. 567.) On September 12, 2006, the plaintiff presented to TPA with complaints of back pain, and she reported that her medications reduced her level of pain from an eight out of ten to a two out of ten and her medications were refilled. (Tr. 571.)

### B. Hearing Testimony: The Plaintiff and the Vocational Expert

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Dr. Gordon Doss, a Vocational Expert ("VE"), testified. (Tr. 593-620.) The plaintiff testified that she completed the tenth grade and never received a GED, and that her last long term job was as a cafeteria worker at a Ford glass plant. (Tr. 595-96.) The plaintiff related that she lost her job in February of 2002, after slipping on a patch of ice and injuring her back and that she has not been able to work since because her back pain precludes her from bending and lifting. (Tr. 596-97, 599, 612.)

The plaintiff testified that her doctors told her that surgery was not an option for correcting her degenerative disease or back strain. (Tr. 600.) She explained that her medication effectively

---

[42] Celebrex is a nonsteroidal anti-inflammatory drug indicated for osteoarthritis, rheumatoid arthritis, ankylosing spondylitis, acute pain, primary dysmenorrhea, and familial adenomatous polyposis. PDR at 3272.

[43] Darvocet is a narcotic painkiller and fever reducer. PDR at 202.

controls her back pain at times but that the pain always returns, and that she relieves her back pain by soaking in hot water, using heating pads, and lying down three to four times a day. (Tr. 600-01.) The plaintiff testified that she can sit for about one hour, stand for about 15 to 20 minutes at a time, only lift less than five pounds, and cannot walk very far before being out of breath. (Tr. 601-02.)

The plaintiff testified that she has anxiety induced panic attacks when she is in "closed place[s]," and when she is around "a lot of people . . . with screaming and hollering," she gets "real nervous" and would not be able to work. (Tr. 602-03.) The plaintiff related that she had never received any mental health treatment because Dr. Lundy prescribed anxiety medications, that Dr. LaLanne was now her primary care physician, who prescribed Prednisone and Hydrocodone for her panic attacks and back pain, and that Dr. Vissers had examined her back and determined that there was nothing he could do to relieve her back pain. (Tr. 603-05.) She also stated that she participated in physical therapy for her back in 2003, but had to stop going "because workman's comp quit paying for it." (Tr. 606.) The plaintiff explained that she attempted to return to work after her physical therapy sessions, but that she lasted only a year because she was not able to bend or lift objects. (Tr. 606-07.)

The plaintiff testified that she lives with her husband and adopted daughter, that she spends most of her time inside her house, that she does very few household chores because of her back pain, and that her husband does the cooking, shopping, driving, and bill-paying and her daughter helps with the cleaning and laundry. (Tr. 602, 610, 614.) She related that she has tried to lose weight by limiting her food intake but that she has been unsuccessful due to medication side-effects and an inability to exercise because of her back pain. (Tr. 612-13.) The plaintiff stated that her weight

limits her ability to walk and bend and has contributed to her back pain but that she is still able to maintain her own hygiene. (Tr. 613-14.)

The VE described the plaintiff as a worker approaching advanced age at the time of the hearing and as a younger worker at the time of her alleged onset date. (Tr. 617.) He classified the plaintiff's food services position as light and unskilled and her role as a sandwich maker as medium and unskilled. *Id.* The ALJ asked the VE to consider the December 17, 2004, medical opinion form completed by Dr. Lundy (tr. 200-02) and the work that the plaintiff would be able to perform, and the VE responded that she would be precluded from all work since that form indicated that she would not be able to work full time and that she had severe pain. (Tr. 617-18.) The ALJ then asked the VE to consider what work the plaintiff would be able to perform if she had a light RFC and given the mental limitations from Dr. Doineau's October 5, 2004, psychological exam (tr. 151-56), and the VE replied that she would have a RFC to perform light and sedentary work. (Tr. 618.) The VE testified that the plaintiff would be able to work as a receptionist, a surveillance system monitor, a parking lot attendant, and counter clerk. (618-19.) The ALJ next asked the VE what type of work the plaintiff could perform if he found the plaintiff's testimony entirely credible, and the VE responded that she would be precluded from performing all work. (Tr. 619.) Finally, the plaintiff's attorney asked the VE to consider Dr. Surber's physical examination and what type of work that the plaintiff would be able to perform, and the VE replied that she would be precluded from all work. (Tr. 620.)

# III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on January 27, 2006. (Tr. 15-23.)  Based on the

record, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social
        Security Act through December 31, 2008.

2.      The claimant has not engaged in substantial gainful activity since
        March 20, 2003, the alleged onset date (20 CFR 404.1520(b),
        404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

                                    * * *

3.      The claimant has the following severe impairments: degenerative disc
        disease, borderline cardiomegaly, depression, anxiety and obesity (20
        CFR 404.1520(c) and 416.920 (c)).

                                    * * *

4.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals one of the listed
        impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
        404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and
        416.926).

5.      After careful consideration of the entire record, I find that the
        claimant has the residual functional capacity to perform
        lifting/carrying 20 pounds occasionally and 10 pounds frequently;
        standing/walking 6 hours; sitting 2 hours with the option to sit and/or
        stand at will; and moderate limitations in persistence and pace.

                                    * * *

6.      The claimant is unable to perform any past relevant work (20 CFR
        404.1565 and 416.965).

                                    * * *

7.      The claimant was born on October 22, 1953 and was 50 years old,
        which is defined as an individual closely approaching advanced age,
        on the alleged onset date (20 CFR 404.1563 and 416.963); and has a

limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

8.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

\* \* \*

10.   The claimant has not been under a "disability," as defined in the Social Security Act, from March 20, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920 (g)).

(Tr. 17-23.)


# IV. DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th

Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant

work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595; *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[44] *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris*

---

[44] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

*v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 22-23.) At step one, the ALJ found that the plaintiff successfully demonstrated that she had not engaged in substantial gainful activity since March 20, 2003, the alleged onset date of disability. (Tr. 17.) At step two, the ALJ found that the plaintiff's degenerative disk disease, borderline cardiomegaly, depression, anxiety, and obesity were severe impairments. *Id.* At step three, the ALJ determined that the plaintiff's impairments, either singly or in any combination, did not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation 4. (Tr. 17-18.) At step four, the ALJ concluded that the plaintiff could perform a limited range of light work but could not perform any of her past relevant work. (Tr. 21-22.) At step five, the ALJ found that the plaintiff could work as a receptionist, surveillance system monitor, parking lot attendant, and counter clerk. (Tr. 23.)

**C. Plaintiff's Assertions of Error**

The plaintiff contends that the ALJ erred in evaluating the medical opinions of Dr. Lundy, her treating physician, and Dr. Surber, a consultative examiner, and in assigning a RFC to the plaintiff that is unsupported by the record medical evidence. Docket Entry No. 15, at 4-9.

**1. The ALJ properly assessed the medical evidence of the plaintiff's treating physician and consultative examiner.**

The plaintiff contends that the ALJ erred in assigning no weight to Dr. Lundy's December 17, 2004, medical opinion form, and to Dr. Surber's October 14, 2004, physical examination. *Id.* From 2002 to 2005, Dr. Lundy examined the plaintiff on multiple occasions (tr. 146, 200-02, 215, 231-38, 243-66, 268, 279-80, 287, 289-90, 305-11, 318-24, 328, 330-32, 334, 427-28, 451-69) and given that regularity, he is classified as a treating source under 20 C.F.R. § 404.1502.[45]  Dr. Surber, a DDS physician, examined the plaintiff on only one occasion and thus would be classified as a consultative examiner. (Tr. 157-62.)

In determining a plaintiff's RFC, an ALJ is required to evaluate and weigh all medical evidence and opinions on record. 20 C.F.R. §§ 404.1527, 416.927.  Medical opinions "are statements from physicians and psychologists or other acceptable medical sources that reflect

---

[45] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

judgments about the nature and severity of [the plaintiff's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The Commissioner has established a hierarchy for the weight of medical opinion evidence: examining sources and treating sources are given more weight than non-examining sources, treating sources are given more weight than one-time examining sources, and specialists are given greater weight than generalists. 20 C.F.R. §§ 404.1527(d)(1)-(5), 416.927(d)(1)-(2).

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) . Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the
> nature and extent of the treatment relationship; (3) the supportability of the opinion

with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

The ALJ focused on the factors of supportability and inconsistency in assigning "no weight" to Dr. Lundy's medical opinion form. (Tr. 21, 200-02.) The ALJ stated:

> In review of the opinion evidence, I give no weight to the findings of Dr. Lundy in [his December 17, 2004, medical opinion form]. He found limitations for a reduced range of sedentary work despite only mild objective findings throughout the medical record and in diagnostic and radiographic tests. His given limitations are inconsistent with his own medical findings. Additionally, he is a treating physician versus orthopedic specialist Dr. Vissers who had the benefit of reviewing later radiographic and x-ray examinations showing only mild degenerative disc disease in addition to physical examinations revealing only mild limitations.

(Tr. 21.) As previously discussed, Dr. Lundy examined the plaintiff on multiple occasions both before and after the plaintiff's alleged onset date. (Tr. 146, 200-02, 215, 231-38, 243-66, 268, 279-80, 287, 289-90, 305-11, 318-24, 328, 330-32, 334, 427-28, 451-69.) He diagnosed the plaintiff with lower back and neck pain, anxiety, and depression, and prescribed Xanax, Skelaxin, Remeron,

Bextra, Soma, Lortab, Ultracet, Lodine, Zanaflex, Meridia, Wellbutrin, Demerol, Imitrex, and Neurontin. *Id.*

Although Dr. Lundy diagnosed the plaintiff with lower back and neck pain, anxiety and depression, the limitations in his medical opinion form (tr. 200-02) and his determination that the plaintiff could not be "reasonably expected to be reliable in attending an 8 hour day, 40 hour work week" (tr. 201) are not supported by his own progress notes. Dr. Lundy's progress notes offer little, if any, description of the severity of the plaintiff's impairments, and his treatment plan for the plaintiff remained largely unchanged from 2002 to 2005. (Tr. 146, 200-02, 215, 231-38, 243-66, 268, 279-80, 287, 289-90, 305-11, 318-24, 328, 330-32, 334, 427-28, 451-69.) Furthermore, on February 26, 2004, Dr. Lundy noted that the plaintiff's medications were controlling her depression and anxiety and stabilizing her back pain. (Tr. 262) The plaintiff also presented to Dr. Lundy on multiple occasions, after her alleged onset date, and did not complain of neck or back pain, anxiety, or depression, other than to request renewal of her prescriptions. (Tr. 217-28, 231-38, 243-51, 254-66, 271-76, 427-28.)

The plaintiff's objective medical tests also do not support the findings in Dr. Lundy's medical opinion form. A November 11, 2003, MRI revealed that the plaintiff had mild degenerative disc disease (tr. 148-49), x-rays from May of 2005 indicated that she had mild thoracic spine spondylosis (tr. 415), and a September 2, 2005, MRI revealed congenital fusion of the vertebral bodies at T10-11, mild spondylosis, and "mild bilateral foraminal stenosis" at L5-S1. (Tr. 463-64.) The plaintiff's MRIs and x-rays repeatedly showed that the plaintiff's back impairments were "mild" (tr. 148-49, 415, 463-64), which does not support the severity of the limitations assigned by Dr. Lundy.

Additionally, the limitations in Dr. Lundy's medical opinion form were inconsistent with other medical evidence in the record. On October 21, 2004, Dr. Moore, a consultative DDS physician, completed a physical RFC assessment on the plaintiff (tr. 163-69) and opined that she could occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds. (Tr. 164.) He noted that the plaintiff could stand/walk or sit for about six hours in an eight hour workday, had unlimited capacity to push/pull, and could frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 164-65.) Dr. Moore also acknowledged that his findings were significantly different that those of the plaintiff's treating physician because he found the plaintiff's complaints to be only "partially credible to a med[ical] level." (Tr. 165, 168.) On September 23, 2005, Dr. Vissers, a consultative orthopedic specialist, examined the plaintiff and diagnosed her with "[l]ow back pain with left lower extremity radicular pain" but concluded that her neurological examination was completely normal. (Tr. 563.) Furthermore, in 2006, the plaintiff reported to TPA on multiple occasions that her medications reduced her level of pain. (Tr. 535, 541, 546, 549, 571, 573, 575.)

In sum, the limitations that Dr. Lundy assigned to the plaintiff in his medical opinion form were not supported by his own treatment notes and were inconsistent with the objective medical evidence in the record. Dr. Lundy's prescribed treatment for the plaintiff over nearly a three year period was subject to minimal variation and did not support his overall conclusion that due to the severity of the plaintiff's pain, she could not be "reasonably expected to be reliable in attending an 8 hour day, 40 hour work week" (Tr. 319.) The ALJ provided "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for according "no weight" to Dr. Lundy's medical opinion form and substantial evidence in the record supports that determination.

The ALJ also focused on the factor of supportability in assigning "no weight" to Dr. Surber's October 14, 2004, physical examination of the plaintiff. (Tr. 21, 157-62.) The Regulations clearly state that "[r]egardless of its source, we will evaluate every medical opinion we receive" and, as previously discussed, the ALJ must consider six different factors when determining how much weight should be assigned to a medical opinion.[46] 20 C.F.R. § 404.1527(d)(2)-(6). The ALJ stated that

> I also give no weight to the findings of Dr. Surber, who also found limitations for a reduced range of sedentary work in [his October 14, 2004, physical examination of the plaintiff]. His findings are inconsistent with his physical examination, which only showed mild to no deficits in range of motion in the neck and back, negative straight leg raise testing, and no neurological deficits. Additionally, he saw the [plaintiff] only one time. Dr. Surber's nearly normal physical examination does not support such strict limitations.

(Tr. 21.)

The RFC limitations that Dr. Surber assigned the plaintiff indicate that the plaintiff would not be able to work full-time or at the sedentary level (tr. 620), but those limitations are not supported by his physical examination of the plaintiff. (Tr. 160-61.) Dr. Surber found that the plaintiff was able to perform neck range of motion exercises with "minimal complaints of discomfort," complained of lower back pain when performing a "squat-and-stand maneuver" but had no complaints of pain during straight leg raise exercises, and had no neurological deficits. (Tr. 159-60.) He concluded that although the plaintiff had "some discomfort" in her lower back and "pain" in her mid-back and neck, she had "no limitation of function" in either area. (Tr. 160.) Furthermore, Dr. Surber qualified the limitations he assigned to the plaintiff by noting that "[h]er impairment-related physical limitations are chiefly in regard to the need for appropriate workup concerning her

---

[46] *See supra* at 26.

mid-back and neck pain, in addition to a current re-evaluation concerning her lower back pain, in addition to management of her other medical problems, all to be coordinated." (Tr. 161.)

The ALJ did not err in assigning "no weight" to the restrictions in Dr. Surber's physical examination. She focused on the factor of supportability, as required by 20 C.F.R. § 404.1527(d), for according "no weight" to his findings, and there is substantial evidence in the record to support her determination.

### 2. The ALJ properly evaluated the plaintiffs physical RFC in determining that she could perform a reduced range of light work.

The plaintiff objects to the ALJ's RFC assessment because it is inconsistent with Dr. Lundy's and Dr. Surber's findings. Docket Entry No. 15, at 8. The ALJ determined that the plaintiff retained the RFC "for lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing/walking 6 hours; sitting 2 hours with the option to sit and/or stand at will; and moderate limitations in persistence and pace." (Tr. 22.) The ALJ concluded that the plaintiff's RFC enabled her to perform a reduced range of light work. (Tr. 23.)

An individual's RFC is "a medical assessment of what that individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of [her] medically determinable impairments." *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at 8 (W.D.Mich. Sept. 29, 2009) (citing 20 C.F.R. § 404.1545). In assessing an individual's RFC, the ALJ considers the individual's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The ALJ should not "substitute [her] opinion for that of a physician," but she is also "not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th

Cir. Aug. 18, 2009) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)). Furthermore, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual capacity finding." *Poe*, 342 Fed. Appx. at 157 (citing *Ford v. Comm'r of Soc. Sec.*, 114 Fed. Appx. 194, 197 (6th Cir. Nov. 10, 2004)).

Specifically, the plaintiff contends that the ALJ erred by giving no weight to Dr. Lundy's and Dr. Surber's findings and in relying on physicians' reports that preceded her onset date. Docket Entry No. 15, at 8-9. As previously discussed, the ALJ provided "good reasons" for according "no weight" to the findings of Dr. Lundy and Dr. Surber and substantial evidence in the record supports that determination. *See supra* at 27-30. Additionally, the ALJ clearly did not assign the plaintiff a RFC based solely upon the medical findings that preceded her onset date. (Tr. 21) She analyzed the medical findings of several physicians, reviewed the plaintiff's objective examinations and noted that a "medium range of exertion may be a bit ambitious in light of positive x-ray findings for degenerative disc disease albeit mild findings," and took into account the plaintiff's reports of the level of her pain from November of 2005, to June of 2006. *Id.* Ultimately, the ALJ assigned the plaintiff a "light" RFC and noted that she could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk for six hours, sit for two hours, and have the option to sit/stand at will. *Id.* Given the ALJ's detailed analysis of the plaintiff's RFC (tr. 16-22), it is clear that she carefully considered all the record evidence and properly concluded that the plaintiff retained the ability to perform substantial gainful activity and more specifically, a reduced range of light work. (Tr. 22.)

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 14) be DENIED, the defendant's motion for judgment on the record (Docket Entry No. 16) be GRANTED, and the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*. 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


JULIET GRIFFIN
United States Magistrate Judge